# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JESSICA HARRISON-HARPER,** | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| v. | : | No. 16-4645 |
| **NIKE, INC.,** (*d/b/a* CONVERSE, INC.) | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                                                                                                                      **September 24, 2018**

## MEMORANDUM OPINION

In this employment discrimination case, Plaintiff, Jessica Harrison-Harper, alleges that she was sexually harassed by one of her female subordinates. Plaintiff further alleges that her employer, Defendant Nike, Inc., failed to remedy the harassment and terminated her in retaliation for complaining about it to her supervisor.

Plaintiff has asserted hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq*. Currently before me is Defendant's Motion for Summary Judgment. For the reasons that follow, Defendant's Motion will be granted and Plaintiff's claims dismissed.

I.  **FACTUAL & PROCEDURAL BACKGROUND**

The following facts are set out in the light most favorable to Plaintiff.

Plaintiff began employment with Defendant on July 7, 2014, as store manager of a Converse retail store. Plaintiff was responsible for, among other things, managing the store's sales staff. That staff included three team "leads," two of whom are relevant to this matter: Jessica Lepera and Tiffany Weil. Plaintiff hired both Ms. Lepera and Ms. Weil in the summer of 2015. (Def.'s SOF ¶¶ 1-2, 10, 12-14; Pl.'s Resp. to Def.'s SOF ¶¶ 1-2, 10, 12-14.)

A.  *Alleged Harassment of Plaintiff by Ms. Lepera*

While employed as one of Plaintiff's leads, Ms. Lepera commented, "more than one time" but not daily, that Plaintiff was attractive. She would remark that Plaintiff was "really hot," and make similar statements, such as "you look hot" and "look at my sexy boss." Ms. Lepera also remarked that she was "jealous" of Ms. Weil because both Plaintiff and Ms. Weil were lesbians, and thus "had something in common." Plaintiff did not believe that Ms. Lepera was lesbian or bisexual, as Ms. Lepera had a boyfriend. However, Ms. Lepera quipped, "over a handful of times," that she wanted to be a member of the lesbian "club." Plaintiff felt that these comments were "weird," "off-placed," and "just stupid," and made her uncomfortable. (Def.'s SOF ¶¶ 117, 124-125; Pl.'s Resp. to Def.'s SOF ¶¶ 117, 124-125; Pl.'s SOF ¶¶ 29-34, 36-38; Def.'s Resp. to Pl.'s SOF ¶¶ 29-24, 36-28; Pl.'s Dep. 126:20-127:3.)

In late August 2015, Plaintiff learned from her other lead, Ms. Weil, that Ms. Lepera had been saying other things about her outside of her presence. Ms. Weil informed Plaintiff that Ms. Lepera told other employees that Plaintiff was flirting with people in the store, including minors. Plaintiff further learned that Ms. Lepera had told employees that she and Plaintiff would frequently "h[ang] out [together] at gay clubs." Additionally, Plaintiff learned that Ms. Lepera

had sent Ms. Weil a screenshot of a post from Plaintiff's girlfriend's social media account. The post contained a photo of Plaintiff's girlfriend with another female, on which Plaintiff had posted a comment: "Two beautiful ladies." In sending the post to Ms. Weil, Ms. Lepera remarked that Plaintiff was "so alpha over her woman [that] she's got to comment on the pictures." (Def.'s SOF ¶¶ 118-123; Pl.'s Resp. to Def.'s SOF ¶¶ 118-123; Pl.'s Dep. 119:25-120:12.)

### B. *Plaintiff Complained of Ms. Lepera's Harassment to the New District Manager Amid Complaints About Plaintiff's Performance.*

As store manager, Plaintiff's immediate supervisor was the district manager for the Pennsylvania/New Jersey district. Beginning on September 21, 2015, that position was filled by Josh Sanders. Before becoming district manager, Mr. Sanders knew who Plaintiff was, but did not have any interactions with her. Mr. Sanders was not aware, at that time, of any issues with Plaintiff's performance or the condition of her store, which Mr. Sanders understood to be running smoothly. (Def.'s SOF ¶¶ 3, 5, 9; Pl.'s Resp. to Def.'s SOF ¶¶ 3, 5, 9; Pls.'s SOF. ¶¶ 1-2; Def.'s Resp. to Pl.'s SOF ¶¶ 1-2.)

However, on September 24, 2015, a few days after becoming district manager, Mr. Sanders was copied on an email sent to Plaintiff by his supervisor—Defendant's Director of Stores, Kimberly Kiefer. The email concerned a complaint made by a customer who had visited Plaintiff's store and attempted to return a pair of sneakers. The customer complained that Plaintiff refused to accept the return and instead advised the customer that she "could sell the shoes on Ebay." The customer complained that this "embarrassed [her] in front of other customers." Ms. Kiefer instructed Plaintiff to "take care of this customer." (Def.'s SOF ¶¶ 6, 23-24, 26-27; Pl.'s Resp. to Def.'s SOF ¶¶ 6, 23-24, 26-27.)

Four days later, on September 28, Plaintiff reached out to Mr. Sanders by email, asking to "touch base" with him. Plaintiff followed up by email on October 2, providing Mr. Sanders a list of topics for discussion, including "[c]ustomer complaint update." The email did not mention any issues related to harassing behavior by Ms. Lepera. Mr. Sanders and Plaintiff would not discuss these matters until October 7. (Def.'s SOF ¶¶ 58, 59; Pl.'s Resp. to Def.'s SOF ¶¶ 58-59; Deposition of Joshua Sanders (hereinafter "Sanders Dep."), Ex. 8, at NIKE 0040.))

A few days before that discussion, on October 3, Mr. Sanders received an email from Ms. Lepera. The email contained a number of complaints about Plaintiff, including that she was unavailable to her staff and rarely worked weekends, despite company guidelines providing that store managers should do so. The email provided a list of weekends on which Plaintiff had allegedly not worked. Also copied on the email was Defendant's Senior Employee Relations Specialist, Crystal Barlow, who emailed Mr. Sanders stating that they should discuss the complaints about Plaintiff. (Def.'s SOF ¶¶ 8, 44-45, 48; Pl.'s Resp. to Def.'s SOF ¶¶ 8,44-45, 48.)

The same day, October 3, Mr. Sanders was forwarded another email sent by Tabitha Pezoldt, the manager of a Nike retail store located next door to Plaintiff's Converse store. In this email, Ms. Pezoldt noted that she received a complaint about Plaintiff from one of the leads in Plaintiff's store. Ms. Pezoldt explained, in a further email on October 6, that she had, on "multiple occasions," been approached by employees of Plaintiff's store who were "unsure as to what to do or even [had] concerns about not being able to reach their store manager [i.e. Plaintiff]." (Def.'s SOF ¶¶ 47, 49; Pl.'s Resp. to Def.'s SOF ¶¶ 47, 49; Dep. of Crystal Barlow, Ex. 7, at NIKE 000148.)

Another issue concerning Plaintiff's performance came to Mr. Sanders' attention on October 5. On that date, Plaintiff copied Mr. Sanders on an email that she sent to Defendant's Loss Prevention Supervisor, "reach[ing] out . . . . regarding an employee discount violation." Plaintiff was referring to an incident in which her relatives visited a Nike store and attempted to use her employee discount. Under Defendant's employee discount policy, relatives of *Converse* employees, like Plaintiff, could not obtain a discount at a *Nike* store unless accompanied by the employee. In this instance, however, Plaintiff did not accompany her relatives when they attempted to obtain the discount at the Nike store. In her email, Plaintiff apologized for this incident and noted that she had not "explained to [these relatives] the difference between shopping at Converse and Nike." (Def.'s SOF ¶¶ 31, 35-36, 39; Pl.'s Resp. to Def.'s SOF ¶¶ 31, 35-36, 39; Pl.'s Dep., Ex. 7.)

On October 6, Plaintiff sent Mr. Sanders a text message following up on her previous requests to "touch base." In this text message, Plaintiff alluded to Ms. Lepera's harassment for the first time, noting that she needed to speak to Mr. Sanders because a "lead ha[d] been saying things about [her]." (Def.'s SOF ¶ 62; Pl.'s Resp. to Def.'s SOF ¶ 62.)

Plaintiff and Mr. Sanders finally spoke by telephone the next day, October 7. In addition to discussing the customer complaint regarding Plaintiff's refusal to accept a return, they also discussed Ms. Lepera's alleged harassment.[1] Mr. Sanders told Plaintiff that he would "partner[]" with other senior employees about it and "get back" to her. However, Plaintiff did not hear from

---

[1] Defendant contends that the record does not establish that Plaintiff informed Mr. Sanders about Ms. Lepera's comments that she was attractive, but rather establishes only that Plaintiff told Mr. Sanders that Ms. Lepera was going through her girlfriend's social media account and had told other employees that Plaintiff flirted with minors. (See Def.'s SOF ¶¶ 66-69.) Plaintiff disagrees, noting that she testified in her deposition to telling Mr. Sanders "everything" about Ms. Lepera's harassment. (Pl.'s SOF ¶ 45.) For purposes of this summary judgment motion, I accept as true Plaintiff's testimony that she informed Mr. Sanders about all of Ms. Lepera's comments and conduct.

5

Mr. Sanders again about Ms. Lepera's alleged harassment.[2] (Def.'s SOF ¶¶ 66, 70; Pl's Resp. to Def.'s SOF ¶¶ 66, 70; Pl's SOF ¶¶ 42, 45-49; Def.'s Resp. to Pl.'s SOF ¶¶ 42, 45-49.)

### C. *Plaintiff's Termination*

After receiving Ms. Lepera's email complaining about Plaintiff's failure to work on weekends, Mr. Sanders reviewed the store's time and attendance records. He found that Plaintiff had not worked during the weekends listed in Ms. Lepera's email and that other store employees were not punching in on time. (Def.'s SOF ¶ 52; Pl.'s Resp. to Def.'s SOF ¶ 52.)[3]

On October 10, Plaintiff emailed Mr. Sanders the store's "Performance Activity Record," in which store managers are responsible for documenting their employees' performance issues. (This document is referred to hereinafter as the "PAR log.") During a phone call on October 15, Mr. Sanders informed Plaintiff that the PAR log she provided was not complete, as it did not include failures by Plaintiff's staff to punch in on time, which failures had previously come to Mr. Sanders' attention. (Def.'s SOF ¶¶ 72-73, 75, 77; Pl.'s Resp. to Def.'s SOF ¶¶ 72-73, 75, 77.)[4]

---

[2] At one point, Plaintiff confronted Ms. Lepera about the comments that Ms. Weil had reported to her—although it is unclear whether this confrontation occurred before or after Plaintiff's October 7 discussion with Mr. Sanders. During that confrontation, Ms. Lepera denied having made the statements. But Plaintiff does not recall any instance of Ms. Lepera engaging in any harassing behavior thereafter. (Def.'s SOF ¶ 128; Pl.'s Resp. to SOF ¶ 128.)

[3] In her Response to Defendant's Statement of Undisputed Material Facts, Plaintiff admits that Mr. Sanders testified to these facts but denies "the substance of the testimony." (See Def.'s SOF ¶ 52; Pl.'s Resp. to Def.'s SOF ¶ 52.) However, Plaintiff does not identify any evidence in the record contradicting the testimony—that Mr. Sanders reviewed the time and attendance records for Plaintiff's store, and found that Plaintiff had not worked on the weekends listed in Ms. Lepera's email and that store employees had not been punching in on time. Accordingly, these facts are deemed undisputed for purposes of Defendant's Motion. See, e.g., Savage v. Judge, 644 F. Supp. 2d 550, 561 (E.D. Pa. 2009) ("It is well-settled that a party opposing a motion for summary judgment must point to specific, affirmative evidence in the record and not simply rely on . . . denials." (internal quotation marks omitted)).

[4] Plaintiff denies Defendant's contention that the PAR log did not document Plaintiff's employees' time and attendance issues, but, again, does not identify any evidence in the record contradicting Defendant's contention, which is supported by the PAR log produced by Defendant. (See Def.'s SOF ¶ 77 (citing Pl.'s

6

On October 27, Mr. Sanders visited Plaintiff's store and met with Plaintiff. During this meeting, they discussed the employee discount violation and Plaintiff's failure to document her staff's attendance policy violations on the PAR log. Mr. Sanders also learned from Plaintiff, during this meeting, that she had decided to rehire an employee named Maxine Bacon, whom Plaintiff had previously disciplined for an incident in which Ms. Bacon called Ms. Lepera a "bitch." Mr. Sanders suggested to Plaintiff that rehiring Ms. Bacon was not a good decision. (Def.'s SOF ¶¶ 19, 84-88; Pl.'s Resp. to Def.'s SOF ¶¶ 19, 84-88; Sanders Dep. 133:7-10.)[5]

Following the October 27 meeting, Mr. Sanders sent a summary of the meeting to Ms. Barlow (Defendant's Senior Employee Relations Specialist). Mr. Sanders recommended to Ms. Barlow that Plaintiff be terminated in light of four issues: (1) the customer complaint, (2) the employee discount violation, (3) time and attendance violations by Plaintiff's employees and Plaintiff's failure to document those violations, and (4) Plaintiff's decision to rehire Ms. Bacon. Ms. Barlow agreed with Mr. Sanders' recommendation, as did Ms. Kiefer (Mr. Sanders' supervisor and Defendant's Director of Stores) and Defendant's Human Resources Business Partner, Derek Lachman. Mr. Sanders would not have been authorized to terminate Plaintiff without such approval. (Def.'s SOF ¶¶ 91-93, 98-99, 101, 105, 107; Pl.'s Resp. to Def.'s SOF ¶¶ 91-93, 98-99, 101, 105, 107.)

---

Dep., Ex. 4); Pl.'s Resp. to Def.'s SOF ¶ 77.) Accordingly, for the same reason discussed in Footnote 3, above, this fact is deemed undisputed for purposes of Defendant's Motion.

[5] In her Response to Defendant's Statement of Undisputed Material Facts, Plaintiff notes that the testimony cited by Defendant does not support the contention that Mr. Sanders was unaware of Plaintiff's decision to rehire Ms. Bacon before the October 27 meeting. However, as noted and corrected in its Reply Brief, Defendant merely cited the wrong page of deposition testimony for this proposition. (See Def.'s SOF ¶ 87; Pl.'s Resp. to Def.'s SOF ¶ 87; Def.'s Reply Br. 1-2 n. 1 (correcting the citation.)) Plaintiff has not identified any evidence in the record contradicting Defendant's contention which, accordingly, is deemed undisputed.

Mr. Sanders returned to the store the following day, October 28, and terminated Plaintiff. (Def.'s SOF ¶ 109; Pl.'s Resp. ¶ 109.)

### D. *The Instant Action*

On August 25, 2016, Plaintiff instituted suit, asserting claims for hostile work environment (Counts III & IV) and retaliation (Counts I & II) under Title VII and the PHRA. In her hostile work environment claims, Plaintiff alleges that she informed Mr. Sanders of Ms. Lepera's harassing comments and conduct, and that he failed to remedy them. And in her retaliation claims, Plaintiff alleges that she was terminated in retaliation for complaining about Ms. Lepera's harassment. Defendant has moved for summary judgment on all claims.

In its Motion, Defendant argues, among other things, that Plaintiff's hostile work environment claims fail because Ms. Lepera's comments and conduct are not sufficiently severe or pervasive to alter Plaintiff's conditions of employment. And as to Plaintiff's retaliation claims, Defendant argues, among other things, that Plaintiff has not put forward sufficient evidence to support a causal link between her complaint of harassment and her subsequent termination. I agree with Defendant as to these two arguments and, accordingly, will grant Defendant's Motion.

## II. **LEGAL STANDARD**

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact in dispute, and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment has been made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). A factual dispute is "material" if it might affect the outcome of the suit under the appropriate governing law. Id. at 423. The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 256.

## III. ANALYSIS

### A. *Plaintiff's Hostile Work Environment Claims*

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's. . . sex." 42 U.S.C. § 2000e-2(a)(1).[6] A plaintiff may establish a violation of Title VII by proving that sexual harassment created a "hostile work environment." Huston v. Proctor & Gamble, 568 F.3d 100 (3d Cir. 2009) (citing Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999)). In order to establish the existence of a hostile work environment, a plaintiff must prove the following: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) the existence of respondeat superior liability. Huston, 568 F.3d. at 104.

---

[6] The same standards that govern Plaintiff's claims under Title VII apply to Plaintiff's claims under the PHRA. See, e.g., Capps v. Mondelez Glob., LLC, 847 F.3d 144, 150 n.1 (3d Cir. 2017).

Defendant contends that it is entitled to summary judgment on Plaintiff's hostile work environment claims for three reasons. First, Defendant argues that Plaintiff cannot demonstrate intentional discrimination *on the basis of sex*, as there is no evidence that Ms. Lepera's comments and conduct were motivated by sexual desire. Second, Defendant maintains that Ms. Lepera's comments were not sufficiently severe or pervasive to create a hostile work environment. And third, Defendant submits that Plaintiff cannot establish respondeat superior liability, because Ms. Lepera was a *subordinate* of Plaintiff, and thus Plaintiff had the authority to discipline her for her harassment. Because I agree with Defendant's second argument—that a reasonable jury could not find Ms. Lepera's comments and conduct to be sufficiently severe or pervasive to create a hostile work environment—I will grant Defendant's Motion as to Plaintiff's hostile work environment claims, and need not reach Defendant's other arguments.

To establish a claim for a hostile work environment, a plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult *that is sufficiently severe or pervasive* to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (emphasis added). As the Supreme Court has explained, the "severe or pervasive" standard is "sufficiently demanding to ensure that Title VII does not become a 'general civility code,'" and accordingly "filter[s] out complaints attacking 'the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); see also Jensen v. Potter, 435 F.3d 444, 451 (3d Cir. 2006) (noting that Title VII "does not mandate a happy workplace").

In determining whether the comments and conduct at issue are sufficiently severe or pervasive to meet this standard, courts consider "the totality of the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Caver v. City of Trenton, 420 F.3d 243, 262-63 (3d Cir. 2005) (quoting Harris, 510 U.S. at 23). Considered in light of these factors, Ms. Lepera's comments and conduct cannot support a hostile work environment claim. As explained below, no reasonable jury could find that Ms. Lepera's comments and conduct constitute harassment so severe or pervasive as to "alter the conditions of [Plaintiff's] employment and create an abusive working environment." Harris, 510 U.S. at 21.

First, Ms. Lepera's comments do not rise to the level of severe. Ms. Lepera's comments about Plaintiff's appearance—that she was "hot" and "sexy"—may be unprofessional and inappropriate for the workplace, but they are not objectively lewd, and are, at most, merely offensive. Compare Funayama v. Nichia Am. Corp., No. 08-cv-5599, 2011 WL 1399844, at *12 (E.D. Pa. Apr. 13, 2011) (noting that a comment that the plaintiff's "body was sexy" was "undoubtedly inappropriate," but holding that it did not support the plaintiff's hostile work environment claim, as it "was not of an objectively lewd or offensive nature"); with Petril v. Cheyney Univ. of Pa., 789 F. Supp. 2d 574, 577, 579 (E.D. Pa. 2011) (holding that the plaintiff stated a hostile work environment claim where, among other things, she alleged that a coworker propositioned her by stating "[c]ome on, let me fuck you real quick," and "[l]et me hit it"). Likewise, Ms. Lepera's other comments—that she wanted to join the lesbian "club;" that she went to "gay clubs" with Plaintiff; that Plaintiff flirted with people in the store, including minors; and that Plaintiff was "alpha over her woman"—are, at most, offensive and inappropriate.

11

Nor can any of Ms. Lepera's comments or conduct reasonably be considered "physically threatening or humiliating." Harris, 510 U.S. at 23. Plaintiff does not contend that Ms. Lepera ever touched her, threatened her, or even propositioned her. And while accessing Plaintiff's girlfriend's social media profile, and sharing that profile with a coworker, may have—as Plaintiff noted in her deposition—"cross[ed] the line" or "inva[ded] [her] privacy," courts have rejected hostile work environment claims based on far more troubling conduct. (Pl.'s Dep. 141:22-142:4.) See, e.g., Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 439 (E.D. Pa. 2001) (granting defendant summary judgment where plaintiff's co-worker "touched her breast, told her she looked fresh, . . . propositioned her," and, in a separate incident, "patted her on the buttocks and breast," noting that while the behavior was "loathsome and inappropriate," it was insufficiently severe or pervasive to support a hostile work environment claim).

Nor does the frequency of Ms. Lepera's comments support Plaintiff's hostile work environment claims. While the comments were made "more than a handful of times," there is no evidence that they were made on a daily or even weekly basis. See Deans v. Kennedy House, Inc., 998 F. Supp. 2d 393, 415-16 (E.D. Pa. 2014) (granting summary judgment to defendant on plaintiff's hostile work environment claim where the plaintiff "d[id] not claim to have been harassed or bothered on a daily or even weekly basis"). And the fact that Plaintiff only reported the conduct one time suggests that the conduct did not persist over a long period. Indeed, Ms. Lepera was only employed under Plaintiff's supervision for a few months—from summer 2015 through Plaintiff's termination in October 2015.

Finally, the undisputed facts reflect that Ms. Lepera's comments and conduct had little effect on Plaintiff's work performance. In this regard, Plaintiff's description of the comments—as "weird," "off-placed," and "just stupid"—is telling. Beyond her testimony that the comments

and conduct made her uncomfortable, Plaintiff has put forward no evidence of any serious impact on her work performance. While harassment need not "cause tangible psychological injury" to be considered severe or pervasive, it must do more than merely "engender[] offensive feelings." Harris, 510 U.S. at 21.

In sum, the comments and conduct Plaintiff complains of cannot support a claim for hostile work environment. Accordingly, I will grant Defendant's Motion as to Plaintiff's hostile work environment claims.

    **B.**    *Retaliation Claims*

"[T]o advance a prima facie case of retaliation, a plaintiff must show that: (1) [she] engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with [her] protected activity; and (3) a causal link exists between [her] protected activity and the employer's adverse action." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). If a plaintiff puts forward sufficient evidence to establish this prima facie case, the burden of production then shifts to the employer to "present a legitimate, non-retaliatory reason for having taken the adverse action." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015). If the employer comes forward with such a reason, the burden "shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. (internal quotation marks and citations omitted).

Defendant does not dispute that Plaintiff's termination was an adverse employment action, but does dispute whether Plaintiff engaged in protected activity, contending that Plaintiff did not complain to Mr. Sanders about sexual harassment. Additionally, Defendant contends that, even if Plaintiff did complain, there is insufficient evidence of a causal link between her

complaint and her termination. Because I agree with Defendant's latter argument—that there is insufficient evidence of a causal connection—I will grant Defendant's Motion as to Plaintiff's retaliation claims.

In order to establish a causal connection for purposes of a prima facie case, a plaintiff must prove one of the following: "(1) an unusually suggestive temporal proximity between the protected employee activity and the adverse action, (2) a pattern of antagonism coupled with timing to establish a causal link, or (3) the evidence gleaned from the record as a whole infers causation." Marra v. Phila. Hous. Auth., 404 F. Supp. 2d 839, 844 (E.D. Pa. 2005) (internal quotation marks and citations omitted). Plaintiff focuses on the first and the third methods of proof. As to timing, Plaintiff notes that her termination occurred only three weeks after reporting Ms. Lepera's harassment to Mr. Sanders, and that such a short interval is sufficiently suggestive of causation. Plaintiff further contends that, even if this temporal proximity alone is insufficient, the record as a whole supports an inference of causation.

"Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007). A period of "less than one month ordinarily would be suggestive of a causal link." McLaughlin v. Fisher, 277 F. App'x 207, 219 (3d Cir. 2008). However, in considering whether the temporal proximity is "unusually suggestive," a court must consider the "timing of events" in "full context." Motto v. Wal-Mart Stores East, LP, 563 F. App'x 160, 163 (3d Cir. 2014).

In Motto, for example, an employee was discharged a mere eleven days after he complained of sexual harassment. 563 F. App'x at 163. However, in concluding that this short interval was not unusually suggestive of retaliation, the court noted that the employee had only complained of harassment "in the *aftermath*" of the incident for which the employee was purportedly terminated. Id. (emphasis added). Thus, the court noted, "[t]he timing [of the termination] was dictated by how long it took [the employee's supervisor] to properly investigate the situation and reach a decision." Id.; see also Braddock v. SEPTA, No. 13-cv-6171, 2016 WL 1182098, at *7 (E.D. Pa. Mar. 28, 2016) (holding that a ten-day interval between the employee's complaint of discrimination and termination was "not unusually suggestive . . . because [the employer] was already in the process of investigating the incident" for which the employee was purportedly terminated).

Here, Plaintiff was terminated a relatively short time (three weeks) after reporting Ms. Lepera's harassment to Mr. Sanders. However, as in Motto and Braddock, Plaintiff's report of harassment followed soon after Mr. Sanders received several reports revealing the issues upon which Plaintiff's termination was largely based, and in the midst of an investigation into those issues. Specifically, the customer complaint about Plaintiff's refusal to accept a return was brought to Mr. Sanders' attention by email on September 24, approximately two weeks before Plaintiff's report regarding Ms. Lepera. And Mr. Sanders spoke to Plaintiff about the customer complaint on October 7, during the same meeting in which Plaintiff reported Ms. Lepera's conduct. Likewise, Mr. Sanders received the complaints from Ms. Lepera and Ms. Pezoldt about Plaintiff's failure to work weekends, and her unavailability to her staff, on October 3, four days before Plaintiff's complaint regarding Ms. Lepera's harassment. Subsequent to receiving these reports, Mr. Sanders reviewed the time and attendance records for Plaintiff's store, which

15

revealed that Plaintiff's employees had not been clocking in on time, and that Plaintiff had not been documenting these failures on the store's PAR log. Finally, Mr. Sanders learned of the employee discount issue on October 5, two days before Plaintiff's complaint regarding Ms. Lepera's harassment.[7] In light of this sequence of events, the timing of Plaintiff's termination cannot reasonably be considered "unusually suggestive," such that it alone is sufficient to support a causal link for purposes of a prima facie case.

In addition to the timing of her termination, Plaintiff argues that other aspects of the record support an inference of a causal link between her complaint of harassment and her termination. Specifically, Plaintiff contends that the record reveals three facts which support such a link: (1) that Mr. Sanders held a positive opinion of Plaintiff's performance before she complained of Ms. Lepera's harassment and that his opinion suddenly changed afterwards; (2) that other store managers were not terminated for the same reasons that Plaintiff was terminated; and (3) that the reasons for terminating Plaintiff were "weak, flimsy, and incapable of belief." (Pl.'s Opp'n 13.) However, as explained below, the undisputed record belies these arguments.

First, Plaintiff argues that Mr. Sanders held a positive opinion of her performance before her complaint of harassment, and that his opinion suddenly changed afterwards. Plaintiff is correct that an inference of retaliation can be drawn where a supervisor had praised an employee's performance before receiving a complaint of harassment, and suddenly adopted a different view afterwards. See Farrell, 206 F.3d at 285 (holding that a causal link could be inferred where the employee was terminated only "three or four weeks after [the employee's

---

[7] Only one of the four purported reasons for Plaintiff's termination—her decision to rehire Ms. Bacon—did not arise out of an investigation based on a report that Mr. Sanders received before she complained of Ms. Lepera's harassment. This issue came to Mr. Sanders' attention on October 27, during the meeting in which they discussed the other three issues.

supervisor] praised [the employee] and asked her about her interest in a promotion"). However, as discussed below, no reasonable reading of the record supports the conclusion that Mr. Sanders praised, or even held a positive view of, Plaintiff's performance before her complaint of harassment on October 7, 2015.

Plaintiff notes that "in late September 2015, [Plaintiff's] store ran smoothly," and that "Plaintiff and her store were not on Mr. Sanders' radar as potential problems." (Pl.'s Opp'n 13 (citing Sanders Dep. 65:7-9, 66:11-14.)) However, it is undisputed that Mr. Sanders: (1) only became district manager on September 21, 2015, (2) did not have any interactions with Plaintiff before that time, and (3) received, within days of becoming district manager, the complaints on which Plaintiff's termination was largely based.

Plaintiff further posits that, prior to receiving her harassment complaint, Mr. Sanders "agreed that [she] displayed strong management skills" and "found that [she] exhibited signs of a solid manager and leader" by, among other things, "attending training sessions," appropriately "handl[ing] an altercation" in the store, and "delegating duties to her leads." (Pl.'s Opp'n 13 (citing Sanders Dep. 72:1-15, 72:16-21, 74:15-75:2 80:10-22, 81:21-82:5, 83:2-15.)) Plaintiff derives this conclusion from Mr. Sanders' deposition, in which Mr. Sanders merely agreed that certain actions Plaintiff took in late September and early October 2015 were appropriate and would be undertaken by a strong manager.[8] But no reasonable reading of the record supports the

---

[8] The following excerpt is representative of Mr. Sanders' testimony in this regard:

> Q. It seems like from these e-mails that she was a store manager who was asking for help when she thought she needed it; is that right?
>
> A. Yes.
>
> Q. Those are skills reflective of a strong store manager; correct?
>
> A. Yes.

17

conclusion that Mr. Sanders ever praised Plaintiff's overall performance—as the supervisor had "praised" the employee in Farrell—or even that Mr. Sanders had come to the conclusion that Plaintiff was, in fact, a strong manager. Accordingly, this aspect of the record cannot support Plaintiff's burden of establishing a causal link.

Second, Plaintiff attempts to establish a causal link by contending that Mr. Sanders did not terminate other managers for the reasons that Plaintiff was terminated. (Pl.'s Opp'n 14.) Evidence of disparate treatment of similarly situated store managers who had not complained of harassment could support an inference of a causal link. See Johnson v. City of Phila., No. 14-cv-1123, 2015 WL 1475277, at *12 (E.D. Pa. Apr. 1, 2015). However, Plaintiff has identified no such evidence. Rather, Plaintiff points only to Mr. Sanders' and Ms. Barlow's deposition testimony that they could not recall terminating other managers for the same reasons that Plaintiff was terminated. (See Pl.'s Opp'n 18-19.) To meet her burden of production at the summary judgment stage, Plaintiff cannot rely on the mere *absence* of evidence of similarly situated employees who were treated similarly to Plaintiff, but, rather, *must come forward* with some evidence demonstrating that similarly situated persons were treated differently. See, e.g., Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998) ("The plaintiff has the burden of demonstrating that similarly situated persons were treated differently.") Accordingly, Plaintiff has not demonstrated a causal connection through evidence of disparate treatment of similarly situated employees.

Third and finally, Plaintiff contends that the reasons for terminating Plaintiff were "weak, flimsy, and incapable of belief." (Pl.'s Opp'n 13.) But Plaintiff's evidence in this regard supports, at most, the conclusion that the decision to terminate Plaintiff was not the wise or correct one—which is insufficient to support the conclusion that her termination was actually

---

(Sanders Dep. 80:16-22.)

motivated by a retaliatory purpose. See, e.g., Daniels, 776 F.3d at 198–99 ("The plaintiff cannot simply show that the employer's decision was wrong or mistaken but rather must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons." (internal quotation marks and alterations omitted)). For example, Plaintiff posits that the employee discount violation should not have led to her termination because she "apologized for the infraction." (Pl.'s Opp'n 16.) Nor, Plaintiff argues, should the customer complaint have led to termination, given that she "reached out to the customer who issued the complaint to remedy the situation." (Id.) But at issue here is not whether Plaintiff's apology for the employee discount violation, and her efforts to remedy the customer complaint, should have satisfied her employer. Rather, at issue is whether a jury could reasonably conclude that these reasons for termination are so implausible or incoherent as to be unworthy of credence, and thus indicative that the true motive for termination was retaliation. The record here, even read in the light most favorable to Plaintiff, does not support that conclusion.[9]

---

[9] For the same reasons, Plaintiff's argument that her failure to work weekends "did not constitute [a] direct violation[] of Defendant's policy" is unavailing. (Pl.'s Opp'n 16.) First, it is undisputed that company guidelines provided that store managers should work weekends, because they are peak business hours. Second, and more importantly, at issue is not whether terminating Plaintiff for failing to work weekends is the correct application of Defendant's policies. Rather, at issue is whether terminating a store manager for that reason is so implausible or incoherent as to give rise to an inference that retaliation was the true motive. See, e.g., Motto, 563 F. App'x at 164 (rejecting employee's retaliation claim, and noting that "[the court's] task is not to determine whether a reasonable jury could conclude that [the employee]'s statements were not threats of violence and therefore [the] decision to terminate [him] was an incorrect application of [the employer's] Policy. Instead, [the court's] task is to determine if the evidence can reasonably support an inference that [the employee's] termination was caused by his engaging in protected activity."). And the record does not support such an inference here.

Likewise unavailing is Plaintiff's argument that her decision to rehire Ms. Bacon did not warrant termination because "prior to the rehire, Plaintiff planned to have a meeting with Ms. Bacon and Ms. Lepera to talk through their issues and ease the tension." (Pl.'s Opp'n 16.) Even if true, that does not

19

In sum, "[t]he anti-discrimination laws do not transform this Court into a super-personnel department vested with the authority to second-guess the wisdom of business decisions." Simmons v. Del Monte Foods, No. 04-cv-1767, 2006 WL 2620395, at *6 (W.D. Pa. Sept. 11, 2006) (citing Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995)). Rather, in determining whether a terminated employee's retaliation claims can survive summary judgment, a court must ascertain whether there is sufficient evidence from which a reasonable jury could conclude that the employee's termination was motivated by a retaliatory purpose. Because Plaintiff has not offered such evidence, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

## IV. CONCLUSION

For the reasons set out above, Defendant's Motion for Summary Judgment will be granted and judgment will be entered in favor of Defendant as to each of Plaintiff's claims.

An appropriate Order follows.

---

support an inference that the decision to terminate Plaintiff was, in fact, motivated by a retaliatory purpose.